UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NICHOLAS J. SOUTHARD,

Plaintiff,

v.

BALLARD MARINE
CONSTRUCTION, INC. and
BALLARD MARINE
CONSTRUCTION, LLC,

Defendants.

CASE NO. C19-5971 BHS

ORDER GRANTING
DEFENDANTS' MOTION TO
DISMISS

This matter comes before the Court on Defendants Ballard Marine Construction,

Inc. and Ballard Marine Construction, LLC's ("Ballard") motion to dismiss for lack of

subject matter jurisdiction. Dkt. 13.[1] The Court has considered the pleadings filed in

support of and in opposition to the motion and the remainder of the file and hereby grants

the motion for the reasons stated herein.

---

[1] Ballard explains in its motion that while Ballard Marine Construction, Inc. employed
Southard and contracted the project at issue and Ballard Marine Construction, LLC neither
employed Southard nor was involved in the project at any relevant time, for the purposes of the
instant motion the distinction between the entities is not relevant and the entities may be referred
to collectively. Dkt. 13 n.1.

# I.   PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Plaintiff Nicholas J. Southard ("Southard") brings claims against Ballard under admiralty and maritime law as modified by the Jones Act, 46 U.S.C. § 30104. Dkt. 1, ⁋ 2. He alleges that the Court has jurisdiction under 46 U.S.C. § 30104, the Jones Act, and 28 U.S.C. § 1333, admiralty jurisdiction. *Id.*

Southard alleges that during all times relevant to this lawsuit, Ballard employed him as a commercial diver and Jones Act seaman. *Id.* ⁋ 6. Between January 6, 2017 and February 11, 2017, Southard alleges Ballard assigned him to a "multi-week saturation dive" on a tunneling project beneath the Suez Canal in Egypt. *Id.* ⁋ 7. During this period, Southard had to breathe "varying combinations of oxygen, helium, and nitrogen, due to the depth and pressure of operations ranging from five bars to an excess of seven bars." *Id.* Ballard's Hyperbaric Senior Project Manager, Justin Costello ("Costello"), declares that the while working on the tunneling project, Southard was in a saturation environment for thirty-five days. Dkt. 14, ⁋ 8.

The tunneling project at issue involved construction of two highway roads under the Suez Canal to connect Egypt and the Sinai Peninsula. Dkt. 14, ⁋ 6. Costello declares that Southard volunteered for the project and that that the project employed Southard as a "Compressed Air Worker" in a pressurized, but dry and terrestrial environment and thus did not involve diving as the term is commonly understood. *Id.* ⁋⁋ 6–7. In a hyperbaric tunnel support project like the one beneath the Suez Canal, "[w]orkers often use a saturation technique and a hyperbaric chamber to work in the pressure environment," so commercial divers often do this work due to their familiarity with the environment, and

1    many of Ballard's employees are trained commercial divers. Dkt. 14, ℙℙ 3, 4. The

2    Compressed Air Workers "perform cleaning and maintenance of the cutterhead of the

3    tunnel boring machine." *Id*. ℙ 4.

4         Costello declares that Ballard is a marine infrastructure and utility contractor

5    which performs marine construction projects and specializes "in a broad range of sectors,

6    including hyperbaric tunnel support, hydroelectric, water utility, nuclear, industrial, port

7    & waterfront development, diving services" and "marine casualty response & salvage."

8    Dkt. 14, ℙ 3. Ballard has worked on tunnel support projects similar to the one at issue for

9    the Seattle Metro Northlink Light Rail Line, the Mexico City Metro, the Toronto Subway

10   extension, and the New York Subway extension. *Id*. ℙ 5.

11        Southard declares that Ballard hired him as a commercial diver in October of

12   2008. Dkt. 17, ℙ 4. Southard declares that he then worked for Ballard until he left the

13   tunnel project at issue in February 2017, interrupted only by service in Iraq with the

14   National Guard from September 2009 through Spring 2011. *Id*. He explains that he

15   worked in "most facets of [Ballard's] wide-ranging work, servicing vessels and

16   performing marine construction work," and "repaired underwater pipelines, salvaged

17   sunken vessels, dredged channels, pile-drived pylons into the seabed, performed open

18   water environmental clean ups, and inspected hulls of cargo ships while afloat." *Id*. ℙ 5.

19   He declares that when he did marine construction work, he would be classified as a

20   "Diver, Tender, Dive Supervisor, Pile Buck, or Pile Buck Foreman," and when he

21   worked on tunneling projects, he would be classified as a "Compressed Air Worker." *Id*.

22   ℙℙ 8–9. He declares that as a Compressed Air Worker, he "could make more money in a

1   week than I would diving for a month. Thus, when a tunneling job became available, I

2   would often take it because the money was so good." *Id.* ¶ 9.

3        Southard lists nine "dive boats" which were "self-propelled vessels in Ballard

4   Marine Construction's fleet during [his] employment." *Id.* ¶ 6. He explains that some of

5   the dive boats were "smaller vessels more akin to a skiff that we often used to move men

6   and materials across the waterways as needed to support the project underway;

7   sometimes we would dive from them too." *Id.* Other larger dive boats "were large enough

8   to support a three or four-person dive team . . . use[d] as our base of operations for some

9   of the underwater projects." *Id.* Southard declares that "[i]n addition to [his] dive

10  responsibilities on the larger Dive Boats, [he] would run all of the Dive Boats . . . among

11  other things, operate and navigate the vessels, handle the lines, dock and moor, and

12  perform vessel maintenance." *Id.*

13       Southard declares that over the course of his employment with Ballard, he

14  "alternated between wet-diving underwater on marine construction projects and dry-

15  diving on tunneling projects," sometimes within the same month, and "roughly 45% of

16  [his] employment with [Ballard] was spent working in the service of vessels owned,

17  operated and/or controlled by [Ballard] on navigable waters." *Id.* ¶ 10. Costello declares

18  that while Southard was working in Egypt, Ballard did not own, operate, or charter any

19  vessels there, Southard was not assigned to or under the call or command of a vessel, and

20

21

22

1  the "closest access to navigable waters was from the tunnel entrance which was

2  approximately two (2) miles from the waters of the Suez Canal." Dkt. 14, ¶ 9.[2]

3        On October 11, 2019, Southard filed suit against Ballard. Dkt. 1. Southard alleged

4  jurisdiction "under the admiralty and maritime law as modified by the Jones Act, 46

5  U.S.C. § 30104." *Id.* ¶ 2. Southard alleged a claim for negligence under the Jones Act

6  resulting in decompression sickness and distal small fiber neuropathy and a claim for

7  maintenance, cure, and unearned wages, specifying that Ballard failed to remove him

8  from his work upon notice of injury and ensure he received prompt medical treatment,

9  thereby incurring liability for his maintenance, wages, and medical care. *Id.* ¶¶ 8–19.

10        On January 16, 2020, Ballard moved to dismiss for lack of subject matter

11  jurisdiction. Dkt. 13. On February 3, 2020, Southard responded. Dkt. 16. On February 7,

12  2020, Ballard replied. Dkt. 18.

## II. DISCUSSION

13  **A. Standard**

15        Federal courts are presumed to lack jurisdiction, and on a motion to dismiss

16  pursuant to Federal Rule of Civil Procedure 12(b)(1) the burden of proof is on the

---

18      [2] Ballard provides additional detail about Southard's work history in the Declaration of Melanie Culp, Ballard's Director of Risk Management, submitted in support of Ballard's reply. Dkt. 19. The declaration focuses on the fact that "[f]rom about February of 2015 until 2017, [Southard] never spent more than 30% of his time on commercial diving assignments." *Id.* ¶ 3. However, the Court does not consider this evidence because submission of arguments or evidence for the first time upon reply is improper as it unfairly deprives the non-movant of an opportunity to respond. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996). The parties also dispute whether the Court may consider the fact that Southard received state workers' compensation benefits. The Court does not rely on this evidence to reach its decision and thus does not decide the issue.

plaintiff to establish subject matter jurisdiction. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). Motions to dismiss brought under Rule 12(b)(1) may challenge jurisdiction factually by "disputing the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction," or facially by "asserting that allegations in the complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). For facial challenges, a plaintiff's allegations are assumed as true and the complaint is construed in his favor. *Id.*

In a factual attack under Rule 12(b)(1), courts "need not presume the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Instead, a factual attack under Rule 12(b)(1) allows district courts to look beyond "the face of the pleadings, [and] review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). Motions to dismiss for lack of subject matter jurisdiction "may be made as a speaking motion attacking the existence of subject matter jurisdiction without converting the motion into a motion for summary judgment." *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1558 (9th Cir. 1987) (citations and internal quotations omitted).

"However, when 'ruling on a jurisdictional motion involving factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment.'" *Id.* (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)). "Under this standard, 'the moving party should prevail only if the material

1    jurisdictional facts are not in dispute and the moving party is entitled to prevail as a

2    matter of law." *Id.* (quoting *Augustine*, 704 F.2d at 1077); *see also  Leite v. Crane Co.*,

3    749 F.3d 1117, 1121 n.3 (9th Cir. 2014) (citations omitted) ("[A] court must leave the

4    resolution of material factual disputes to the trier of fact when the issue of subject-matter

5    jurisdiction is intertwined with an element of the merits of the plaintiff's claims.").

6    Ballard presents a factual challenge to Southard's assertion that the Court has subject-

7    matter jurisdiction. Dkt. 13 at 6.

8        As a threshold matter, the parties dispute the standard the Court should apply in

9    reviewing Southard's claim to seaman status as the basis for subject matter jurisdiction.

10   Southard argues that Ballard's motion turns on his employment connection to Ballard's

11   vessels, which "is the heart of the seaman status inquiry, and, therefore, the merits of

12   [Southard's] two seamen's causes of action asserted in the complaint." Dkt. 16 at 8.

13   Ballard argues that the summary judgment standard should not apply because it has not

14   challenged the merits of Southard's negligence claims. Dkt. 18 at 2.[3] Ballard notes that

15   "[t]here appear to be few, if any, factual disputes between Southard's general

16   characterization of his employment with Ballard and Ballard's more specific description

17   of the relevant portions of Southard's employment" so "[i]f the Court employs the

18   summary judgment standard . . . the result should be the same." Dkt. 18 at 2 n.1 (citing

19   Dkt. 19 at 5–42).

20

21        [3] Ballard argues that even if the Court finds subject-matter jurisdiction, it should be
    permitted to challenge Southard's seaman status in a later motion to dismiss for failure to state a

22   claim. Dkt. 13 at 13 n.8.

1    Southard is correct that proving seaman status under the Jones Act is an element of

2    recovery for negligence claims under the Jones Act and for maintenance and cure claims

3    under maritime law. *See* Ninth Circuit Manual of Model Civil Jury Instructions, 7.1, 7.2,

4    7.11. Thus, Southard is correct that the jurisdictional issue of seaman status also goes to

5    the merits, and though he retains the burden of proof, *Stock West*, 873 F.2d at 1225,

6    Ballard should prevail only if "the material jurisdictional facts are not in dispute" and it is

7    "entitled to prevail as a matter of law," *Trentacosta*, 813 F.2d at 1558.

8    **B.    Federal Question Jurisdiction**

9    Southard's complaint alleges that the Court has jurisdiction pursuant to the Jones

10   Act, 46 U.S.C. § 30104, and pursuant to admiralty jurisdiction, 28 U.S.C. § 1333. Dkt. 1,

11   ¶¶ 2, 8–19. However, Southard argues that his complaint "conferred federal question

12   jurisdiction by properly pleading a negligence cause of action under the Jones Act" and

13   asks that he be granted leave to amend if the Court does not find subject-matter

14   jurisdiction based on his Jones Act claim. Dkt. 16 at 2–3. Southard's response does not

15   argue his claims as pled meet the standard for admiralty and maritime jurisdiction. If the

16   Court finds jurisdiction under the Jones Act, Ballard requests that it also decide admiralty

17   and maritime jurisdiction, arguing that Southard may ask that the Court take

18   supplemental jurisdiction over his maintenance and cure claim, which Ballard argues is

19   impermissible. Dkt. 18 at 9–10.

20   The Jones Act provides a remedy for "any seaman" injured "in the course of his

21   employment," 46 U.S.C. § 688, and allows a seaman so injured to bring a civil action at

22

1    law with a jury trial, 46 U.S.C. § 30104. The issue of seaman status has been litigated

2    extensively.

3           In *Chandris, Inc. v. Latsis*, 515 U.S. 347, 350 (1995) ("*Chandris*"), the Supreme

4    Court explained that it had previously determined that under the Jones Act, "a seaman's

5    job need not be limited to transportation-related functions that directly aid in the vessel's

6    navigation," and turned to the question of "what *relationship* a worker must have to the

7    vessel, regardless of the specific tasks the worker undertakes, in order to obtain seaman

8    status." (citing *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355 (1991)). Tracing the

9    development of the legal distinction between seamen and land-based maritime workers,

10   the Supreme Court concluded "[i]t is therefore well settled after decades of judicial

11   interpretation that the Jones Act inquiry is fundamentally status based: Land-based

12   maritime workers do not become seamen because they happen to be working on board a

13   vessel when they are injured, and seamen do not lose Jones Act protection when the

14   course of their service to a vessel takes them ashore." *Id*. at 361.

15          The Supreme Court warned that "[i]n evaluating the employment-related

16   connection of a maritime worker to a vessel in navigation, courts should not employ 'a

17   'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of

18   injury; a more enduring relationship is contemplated in the jurisprudence.'" *Id.* at 363

19   (quoting *Easley v. Southern Shipbuilding Corp.*, 965 F.2d 1, 5 (5th Cir. 1992)). "Thus, a

20   worker may not oscillate back and forth between Jones Act coverage and other remedies

21   depending on the activity in which the worker was engaged while injured." *Id.* (citing

22   *Reeves v. Mobile Dredging & Pumping Co.*, 26 F.3d 1247, 1256 (3rd Cir. 1994)). The

1    Supreme Court explained this was consistent with the interests of employers and

2    employees in being able to predict who will be covered by the Jones Act "before a

3    particular workday begins." *Id*. "Generally, the Fifth Circuit seems to have identified an

4    appropriate rule of thumb for the ordinary case: A worker who spends less than about 30

5    percent of his time in the service of a vessel in navigation should not qualify as a seaman

6    under the Jones Act." *Id*. at 371.

7      However, in considering how much of a plaintiff's course of employment to

8    evaluate, the Supreme Court found no reason to consider exclusively "the overall course

9    of a worker's service with a particular employer," explaining that seaman status may

10   change with a worker's "basic assignment." *Id*. at 371–72 (citations omitted).

11      For example, we can imagine situations in which someone who had worked
   for years in an employer's shoreside headquarters is then reassigned to a

12      ship in a classic seaman's job that involves a regular and continuous, rather
   than intermittent, commitment of the worker's labor to the function of a

13      vessel. Such a person should not be denied seaman status if injured shortly
   after the reassignment, just as someone actually transferred to a desk job in

14      the company's office and injured in the hallway should not be entitled to
   claim seaman status on the basis of prior service at sea. If a maritime

15      employee receives a new work assignment in which his essential duties are
   changed, he is entitled to have the assessment of the substantiality of his

16      vessel-related work made on the basis of his activities in his new position.

17   *Id*. at 372 (citing Joseph D. Cheavens, 64 Tulane L. Rev., 361, 389–90 (1989)).

18     Following *Chandris*, courts use its two-element test for seaman status. A plaintiff

19   is a Jones Act seaman only if (1) his duties contribute to the function of the vessel or to

20   the accomplishment of its mission, and (2) he has a connection to a vessel in navigation

21   that is substantial both in duration and in nature. *Cabral v. Healy Tibbits Builders, Inc.*,

22   128 F.3d 1289, 1292 (9th Cir. 1997) (citing *Chandris*, 515 U.S. at 368).

1
2
3
4

>  For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea. This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees.

*Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 555 (1997). The issue of seaman status

under the Jones Act "is a mixed question of law and fact, and it often will be

inappropriate to take the question from the jury." *Id.* at 554.

In *Harbor Tug & Barge*, the Supreme Court considered a plaintiff who was

injured in the course of a one-day job painting a docked tugboat. *Id*. at 559. The plaintiff

had been hired by the tug's owner on twelve instances over the two-and-a-half months

before his injury and had worked on the tug at issue on three or four occasions prior to his

injury. *Id*. The plaintiff also testified that seventy percent of his work (for the tug's owner

and other marina employers) over the two-and-a-half years prior to his injury was

deckhand work which involved "manning the lines on- and off-board vessels while they

docked or undocked." *Id*. at 551, 559. The first element of the test, that the plaintiff's

work contributed to the function of these vessels, was not contested. *Id*. at 554.

The Supreme Court found that as none of the plaintiff's work aboard the tug where

he was injured was of a seagoing nature, no reasonable inference supported a conclusion

that his work with the tug's owner was seagoing, and "[i]n any event, these discrete

engagements were separate from the one in question, which was the sort of 'transitory or

sporadic' connection to a vessel or group of vessels that, as we explained in *Chandris*,

does not qualify one for seaman status." *Id*. at 560 (citing *Chandris*, 515 U.S. at 368).

1    Moreover, as the concept of a group of vessels required a degree of common control,

2    there was no applicable group of vessels where the plaintiff referred to vessels owned and

3    controlled by different entities. *Id.*

4        In *Cabral*, the Ninth Circuit considered a plaintiff who was injured while working

5    as the crane operator for a construction project at a ferry landing. *Cabral*, 128 F.3d at

6    1291. The crane was mounted on a floating barge. *Id.* The plaintiff was injured

7    approximately six weeks into the job; prior to a ten-week hiatus leading up to the crane

8    operator job, he had worked "on a variety of land and sea-based projects" for the

9    employer over an eleven-month period. *Id.* The first element was not contested. As to the

10   second element, the Ninth Circuit explained that *Harbor Tug* and *Chandris* "dictate that

11   when we determine whether the nature of [the plaintiff's] connection to [the barge] is

12   substantial, we should focus on whether [the plaintiff's] duties were primarily sea-based

13   activities." *Id.* at 1293. It concluded that "[a]ll of the evidence points to one conclusion,

14   that [the plaintiff] was a land-based crane operator who happened to be assigned to a

15   project which required him to work aboard [the barge]," so there was no evidence from

16   which a reasonable jury could conclude the plaintiff had a substantial connection to the

17   barge. *Id.*

18       In an unpublished disposition, *James v. Wards Cove Packing Co., Inc.*, 209 F.

19   App'x 648, 649 (9th Cir. 2006), the Ninth Circuit reversed the district court's grant of

20   summary judgment based on the plaintiff's failure to establish a substantial connection to

21   the employer's fleet of vessels in navigation. The Ninth Circuit explained that "[w]hen

22   assessing a maritime worker's seaman status, the relevant time period in assessing 'the

1   substantiality of his vessel-related work' is the period of time the worker spent in the

2   position he occupied at the time of the accident." *Id.* at 650 (quoting *Chandris*, 515 U.S.

3   at 372). "When a worker has worked for a particular employer over a number of years,

4   but his 'essential duties' have changed during that time, the evaluation of his seaman

5   status shall focus only on the current assignment." *Id.* (citing *Chandris*, 515 U.S. at 372).

6   Focusing on the plaintiff's essential duties and discounting his job title and pay, the Ninth

7   Circuit found a question of fact as to whether the plaintiff's essential duties in the job at

8   the time of injury, in Seattle on a vessel moored for the winter, were the same as in

9   previous work with the employer in Alaska. *Id*. Further, the district court had erred in

10  limiting its consideration of whether the plaintiff worked at sea to the Seattle work, when

11  it should have considered both the Alaska and the Seattle work. *Id*.

12        **1.      Contribution to the Function of the Vessel or its Mission**

13        Regarding the first element, Southard argues that he "worked at sea in the service

14  of the ship," *Chandris*, 515 U.S. at 368, when he operated and navigated the Dive Boats,

15  "handling the lines, docking and mooring, and performing vessel maintenance" and

16  contributed to the mission of the dive boats "either by directly aiding in navigation, or by

17  performing the vessel's work on marine construction jobs." Dkt. 16 at 13. Ballard argues

18  in essence that when on tunneling jobs as a Compressed Air Worker, Southard

19  maintained no connection to a vessel or to the navigable waters whatsoever. Dkt. 13 at

20  11. Given that under the first element "'[a]ll who work at sea in the service of a ship' are

21  *eligible* for seaman status," *Chandris*, 515 U.S. at 368 (quoting *Wilander*, 498 U.S. at

22

354), Ballard's arguments about the appropriate scope of employment for consideration are best addressed in the context of the second element.

### 2.     Connection to a Vessel in Navigation

Regarding the second element, Southard argues that he "regularly braved the perils of sea, both while abroad Defendants' vessels and while underwater diving for Defendants, performing marine contracts for their customers." Dkt. 16 at 13–14. He argues that over the course of his employment, he spent 45% of his time in service of Ballard's vessels, diving from them or working aboard them and performing "vessel services and marine construction projects," thus establishing a substantial connection in both nature and duration to Ballard's vessels well in excess of the 30% rule of thumb the Supreme Court identified in *Chandris*. *Id*. at 13–14 (citing *Chandris*, 515 U.S. at 371–72).[4]

Southard emphasizes that under two Fifth Circuit cases decided prior to *Chandris*, there is no requirement that a seaman's injury take place while in service to a vessel, Dkt. 16 at 16–17 (citing *Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422 (5th Cir. 1997) ("*Higginbotham*"), *rev'd on other grounds by Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618 (1978), and *Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447 (5th Cir. 1980) ("*Guidry*")), this argument relies on the proposition that seaman status continues during a

---

[4] Even if the Court had considered the facts asserted in the Declaration of Melanie Culp, Dkt. 19, that Southard's tunneling work represented more than 70% of his time in the two years leading up to the injury, the Court would still find as discussed below that given Southard's substantially varying work assignments, the 30% rule of thumb does not indicate in this case that a greater duration of his career with Ballard should be evaluated.

1    new assignment with new essential duties. In *Higginbotham*, the Fifth Circuit found

2    undisputed evidence that based on the plaintiff's prior two years of work, he was a

3    seaman "despite intermittent temporary assignments to fixed platforms as the course of

4    drilling operations required." *Higginbotham*, 545 F.2d at 433. In *Guidry*, the Fifth Circuit

5    stated that the Jones Act permits recovery for a seaman's onshore workers and "[does

6    not] require that his tasks at the time he is injured be related to service of the ship."

7    *Guidry*, 614 F.2d at 453 (citations omitted). However, the Fifth Circuit explained that the

8    plaintiff, who asked to be part of the crew sent to operate a piece of the vessel's

9    equipment for land-based during the winter season could potentially be a seaman because

10   of his connection to the vessel and expectation of returning to it, the factfinder would also

11   have to decide "that the nature of his assignment ashore did not sever his vessel

12   connection and thus end his maritime status." *Id*.

13       *Chandris* speaks to this question by differentiating between what is improper in

14   deciding seaman status, "inspecting only the situation as it exists at the instant of injury"

15   and what is proper, that "someone actually transferred to a desk job in the company's

16   office and injured in the hallway should not be entitled to claim seaman status on the

17   basis of prior service at sea." *Chandris*, 515 U.S. at 363, 372. In considering the mixed

18   question of law and fact of seaman status, "it is the court's duty to define the appropriate

19   standard" and "[t]he jury should be permitted . . . to consider all *relevant* circumstances."

20   *Id*. at 369 (emphasis added). Considering the "rule of the thumb for the ordinary case,"

21   that "[a] worker who spends less than about 30 percent of his time in the service of a

22   vessel in navigation should not qualify as a seaman under the Jones Act," the Court must

1    determine what portion of Southard's employment history would be relevant to this rule.

2    *Id*. at 371.

3        In *Chandris*, just after describing the 30% rule, the Supreme Court went on to

4    explain that it "see[s] no reason to limit the seaman status inquiry . . . exclusively to an

5    examination of the overall course of a worker's service with a particular employer. When

6    a maritime worker's basic assignment changes, his seaman status may change as well."

7    *Id*. at 371–72. As noted, when applying this analysis, the Ninth Circuit explained that

8    "the relevant time period in assessing 'the substantiality of his vessel-related work' is the

9    period of time the worker spent in the position he occupied at the time of the accident."

10   *James*, 209 F. App'x at 650 (quoting *Chandris*, 515 U.S. at 372). Though a worker may

11   have worked for a particular employer for a period of years, if his essential duties have

12   changed, "the evaluation of his seaman status shall focus only on the current

13   assignment." *Id*. (citing *Chandris*, 515 U.S. at 372).

14       Over the course of Southard's employment he describes assignments which clearly

15   incorporate duties that would invoke seaman status such as operating and navigating

16   vessels, marine construction work that likely involves tasks or a work setting that would

17   invoke seaman status, and work in dry tunnels with no connection to a vessel. Dkt. 17, ⁋⁋

18   5, 6. The duties Southard performed in his marine work, that he "repaired underwater

19   pipelines, salvaged sunken vessels, dredged channels, pile-drived pylons into the seabed,

20   performed open water environmental clean ups, and inspected hulls of cargo ships while

21   afloat," are fully separate from the duties of the tunnel work, "maintaining and repairing

22   the heavy machinery used to dig the tunnels." *Id.* ⁋⁋ 5, 9. The only similarity is in the use

1    of technologies which permit work in the pressurized environment. *Id.* ¶ 10; Dkt. 14, ¶¶

2    3–4.

3          Thus, the relevant time period for the 30% rule of thumb is not Southard's entire

4    course of employment when Southard had no primary set of duties from which the dry

5    tunneling work could be fairly characterized as a temporary deviation—instead,

6    Southard's connection to Ballard's vessels was "intermittent," and his tunneling work

7    was a different "basic assignment" with different "essential duties." *See Chandris*, 515

8    U.S. at 371–72; *James*, 209 F. App'x at 650. The Court concludes that when performing

9    tunneling work, Southard's essential duties changed sufficiently that only the tunneling

10   assignment is relevant; that is, consistent with *Chandris*, the Court is focused on the most

11   recent tunneling assignment. This conclusion is consistent with the status-based Jones

12   Act inquiry, "granting the negligence cause of action to those maritime workers who

13   form the ship's company." *Chandris*, 515 U.S. at 362 (citing *Swanson v. Marra Bros.,*

14   *Inc.*, 328 U.S. 1, 4–5 (1946); *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36

15   42–43 (1943)). When doing tunneling work, Southard was not a member of a ship's

16   company. It is also consistent with the "interests of employers and maritime workers

17   alike in being able to predict who will be covered by the Jones Act . . . before a particular

18   workday begins." *Id.* at 363. On the facts of this case, the coverage inquiry would remain

19   predictable because the record does not show that Southard maintained a link to Ballard's

20   marine work while on tunneling assignments.

21          Therefore, considering the relevant time period of the tunneling assignment, no

22   reasonable juror could conclude that during the more than a month Southard spent as a

1   Compressed Air Worker in Egypt he maintained a connection to Ballard's vessels that

2   was substantial in nature or duration. *See Cabral*, 128 F.3d at 1292; *Harbor Tug*, 520

3   U.S. at 555. As Southard has not met his burden to establish a dispute of fact on the

4   second element of jurisdiction under the Jones Act, the Court grants Ballard's motion to

5   dismiss.

6   **C.     Admiralty and Maritime Jurisdiction**

7           As noted, Southard's complaint invokes the Court's admiralty jurisdiction, Dkt. 1,

8   ¶ 2, but his responsive brief argues that he need not satisfy the locality and connection

9   tests because he can establish jurisdiction under the Jones Act, Dkt. 16 at 15–16. As the

10  Court found Southard did not establish jurisdiction under the Jones Act, the Court briefly

11  addresses admiralty jurisdiction.

12          The party seeking to invoke admiralty jurisdiction bears the burden to establish

13  that it applies. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527,

14  534 (1995). Both (1) the locality test and (2) the connection test must be satisfied. *Id*.

15  Under the locality test, admiralty jurisdiction is appropriate if "the tort occurred on

16  navigable water or [if] the injury suffered on land was caused by a vessel on navigable

17  water." *Id*. The Ninth Circuit holds that "the situs of a tort for the purpose of determining

18  admiralty jurisdiction is the place where the injury occurs," "even when some of the

19  negligent activity occurs on land." *Taghadomi v. U.S.*, 401 F.3d 1080, 1084 (9th Cir.

20  2005) (citations omitted). The connection test is satisfied if (1) the incident has a

21  potentially disruptive impact on maritime commerce and (2) the general character of the

22

1    activity giving rise to the incident shows a substantial relationship to traditional maritime

2    activity. *Sisson v. Ruby*, 497 U.S. 358, 370–72 (1990); *Grubart*, 513 U.S. at 534.

3          According to the undisputed facts of this case, Southard's injury occurred entirely

4    on land. Even if the location of the negligent activity were relevant, Southard makes no

5    allegation and submits no evidence from which a factfinder could conclude that his injury

6    was caused by or occurred on the navigable waters or a vessel. Therefore, to the degree

7    that Southard seeks to invoke the Court's admiralty jurisdiction, he has failed to satisfy

8    the locality test. As the party seeking to invoke admiralty jurisdiction must satisfy both

9    tests, it is unnecessary to reach the connection test. Therefore, the Court is without

10   subject-matter jurisdiction on Southard's claims.

11   **D.    Leave to Amend**

12         In the event the court finds that dismissal is warranted, the court should grant the

13   plaintiff leave to amend unless amendment would be futile. *Eminence Capital, LLC v.*

14   *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). As it is possible the complaint could

15   be cured by amendment, the Court grants Southard's requested leave to amend.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

1

### III.  ORDER

2       Therefore, it is hereby **ORDERED** that Ballard's motion to dismiss, Dkt. 13, is

3   **GRANTED** and Southard is **GRANTED** leave to amend. Southard may file an amended

4   complaint no later than May 15, 2020. Failure to file to file an amended complaint or

5   otherwise respond will result in dismissal with prejudice.

6       Dated this 6th day of May, 2020.

7

8

9                                       BENJAMIN H. SETTLE
                                        United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22